<em>Judgment reversed.</em>

---

## HIRAM B. SCUTT

v.

## DANIEL ROBERTSON.

*Partnership—Bill for Accounting—Ownership of Tonnage License to Manufacture Barbed Wire—Agency—Costs.*

Upon a bill filed by one of two partners, after the dissolution of the firm, for a settlement of the partnership accounts, it is *held:* That the tonnage license, from the owners of certain letters patent, under which the firm had manufactured barb·d wire, was the property and an asset of the firm and not the individual property of the defendant; that in procuring such license the defendant acted for the firm; that the issue of the license was part of an arrangement by which a corporation in which the parties were interested was dissolved and the firm organized to succeed to its business; that in procuring the license he acted for such of the stockholders of· the corporation as should actually become members of the proposed firm; and that the defendant should account for the value of certain tonnage for which he surrendered the license and appropriated the benefits derived from such surrender.

[Opinion filed February 10, 1888.]

Scutt v. Robertson.

APPEAL from the Circuit Court of Will County; the Hon. CHARLES BLANCHARD, Judge, presiding.

Messrs. GARNSEY & KNOX and HALEY & O'DONNELL, for appellant.

Messrs. C. A. HILL and GEORGE S. HOUSE, for appellee.

BAKER, J. In 1875 the original firm of H. B. Scutt & Company, composed of Hiram B. Scutt, Ward Dillman, William Watkins and Israel B. Curtiss, was engaged in the manufacture of barbed fencing, under a patent that had been issued to said Scutt.

Early in 1876, Curtiss and Dillman retired from the firm, and James R. Ashley and C. N. Ashley were substituted as members thereof. The fencing made by the firm consisted of a twisted strip of metal with prongs inserted in it at short distances, and it soon became manifest such fencing could not successfully compete with wire having barbs upon it. On the 1st of August, 1876, letters patent No. 180,656 were issued to H. B. Scutt, for what is known to the trade as the "Scutt Barb," it being a flat metal barb inserted between twisted wires; the device patented seems to have been, principally, the contrivance of Scutt, aided by suggestions from Watkins, and the firm paid all the expense and charges of procuring the patent; and the firm manufactured wire under it to a limited extent, until the 30th of September, 1876, said Watkins having in the meantime, about the first of September, sold out his interest in the business to the other members of the firm of H. B. Scutt & Company, and the business of the firm being continued under the same firm name.

In the latter part of September, 1876, a corporation was formed known as "The Joliet Wire Fence Company," with a capital stock of $50,000, divided into 500 shares of $100 each; the patent was put into the corporation at $35,000, the machinery and stock on hand at $5,000 and $10,000 in cash was put in by A. B. Meeker, H. S. Smith, H. A. Bigelow and W. S. Brooks, in unequal proportions. By deed dated September

29, 1876, H. B. Scutt conveyed to the firm of H. B. Scutt & Company, letters patent No. 180,656; and by deed dated September 30, 1876, the firm of H. B. Scutt & Company conveyed to the Joliet Wire Fence Company, said letters patent No. 180,656.

The original subscriptions of stock made upon the stock subscription book of the corporation were evidently of a merely preliminary character, and made for the purpose of convenience in the organization of the company in accordance with the agreement that had been entered into between the firm of H. B. Scutt & Company and Messrs. Meeker, Smith, Bigelow and Brooks, and after the organization was completed some of the first stock certificates were surrendered and canceled, and new certificates issued in lieu thereof, so that after October 3, 1876, the stock of the company was owned and held as follows: 250 shares by H. B. Scutt & Company, eighty-five shares by Meeker, eighty-five shares by Brooks, fifty shares by Smith and thirty shares by Bigelow.

The Joliet Wire Fence Company manufactured and sold the "Scutt Barb," which was supposed or claimed to be covered and secured by letters patent No. 180,656, and the business done by it was both extensive and profitable. On the first day of October, 1877, C. N. Ashley, of the firm of H. B. Scutt & Company, sold to Daniel Robertson, appellee in the present controversy, eighty shares of stock in the corporation for $10,000, and a certificate of stock for said eighty shares signed by Scutt, appellant herein, as president of the company, was issued to Robertson. At the time of this purchase of stock by Robertson the title to letters patent No. 180,656 stood vested of record in the Joliet Wire Fence Company, the deeds from H. B. Scutt to H. B. Scutt & Company from the latter to the corporation having been duly recorded in the patent office on October 19, 1876.

In December, 1876, the Washburn & Moen Manufacturing Company and I. L. Elwood, who claimed to own and control the patents under which barb wire of any description could be manufactured, in other words the "bottom patents" covering barb wire fencing, instituted two suits in the United

Scutt v. Robertson.

States Court at Chicago against the Joliet Wire Fence Company, claiming an infringement of their patents and seeking to enjoin the last named company from manufacturing barb wire. In the latter part of 1878, as this litigation was still pending, and, as the Joliet company had made a large amount of barbed wire and very considerable sums were claimed by the Washburn & Moen Company and by Elwood for damages, the stockholders in the Joliet company were exceedingly anxious with reference to the results of the litigation. The profits of the business were, therefore, distributed among the stockholders about as fast as earned, and on the 13th of August, 1878, the capital stock of the company was reduced from $50,000 to $10,000. Prior to this time there had been a diversity of opinion among the stockholders; Meeker, Smith, Brooks and Bigelow desiring large and frequent dividends, and Scutt, Robertson and the two Ashleys insisting that the profits should be retained by the corporation and used in extending its business. In the fall of 1878 the four stockholders first mentioned were desirous of closing up the business of the wire fence company and retiring from the barb wire business, and anxious that an arrangement should be made with the Washburn & Moen Company and Elwood, whereby all liability for damages should be released and they allowed to retain the moneys they had made; and while Scutt, Robertson and J. R. and C. N. Ashley were also desirous of securing immunity from damages, they were also, each of them, anxious to continue the manufacture of barbed wire. In September or October, 1878, Scutt, who was president of the fence company, was sent by that company to Worcester for the purpose of conferring with the Washburn & Moen Company and ascertaining whether or not a compromise could be effected which would stop the pending litigation and release the fence company and its stockholders from all claim for damages. Upon his return he reported that a settlement could be made relieving the corporation from damages, but only on condition that the corporation would close up its business and assign all its patents to the Washburn & Moen Company; and that Mr. Washburn would be in Chicago in November or December,

and that a conference could be had and settlement made with him at that time.

At a meeting of the board of directors of the wire fence company, held on the 18th day of November, 1878, the following resolution was unanimously adopted:

"Whereas, the Washburn & Moen Manufacturing Company and I. L. Elwood have, by their attorney, made certain overtures for settlement of the litigation now pending between this company and the parties above mentioned; be it resolved by the board of directors of the Joliet Wire Fence Company, that its president be appointed a committee of one, with power to confer with said parties and to act as may, in his judgment, be deemed best for the interests of this company, and upon the following terms, which are agreed to, to wit: 'The Washburn & Moen Manufacturing Company to grant full indemnity for all damages for the past and up to January 1, 1879, and the Joliet Wire Fence Company to retire from the business of manufacturing barbed fence-wire at that time, and to assign all patents under their control to the Washburn & Moen Manufacturing Company.'"

On the 5th day of December, 1878, at a meeting of said board of directors then held, the following resolution was adopted, to wit:

"Resolved, by the board of directors of the Joliet Wire Fence Company, this day convened in regular session, that the executive committee of this board be and they are hereby authorized to sell to any responsible parties the machinery, tools, fixtures, contracts for labor, leases, and all the franchises, etc., of this, the said Joliet Wire Fence Company, at such price and at such terms as to them may seem a fair valuation for the same, and to deliver possession thereof on the first day of January, A. D. 1879."

The Joliet Wire Fence Company, by H. B. Scutt, its president, by deed dated December 12, 1878, conveyed letters patent No. 180,656, to Hiram B. Scutt; and said Hiram B. Scutt by deed dated December 18, 1878, conveyed said letters patent to the Washburn & Moen Manufacturing Company. On the same 18th day of December the wire fence company, at

Scutt v. Robertson.

a meeting of its Board of Directors, reconsidered so much of the resolution adopted on December 5th as referred to the sale of the franchises of the company, and adopted the resolution following, to wit:

"Resolved, by the Board of Directors of the Joliet Wire Fence Company that they do hereby ratify the assignment to H. B. Scutt of the following described letters patent, to wit : letters patent No. 180,656, dated August 1, 1876, and letters patent No. 193,557, dated July 24, 1877, applied for and granted to H. B. Scutt, patentee and assignor. And that said company also assign to said Scutt all their right, title and interest, if any, in and to all letters patent under which they have been operating, or hold under their control."

On the same 18th day of December the Washburn & Moen Manufacturing Company executed to the Joliet Wire Fence Company a release of all damages, and on the same day a written agreement was entered into by the Washburn & Moen Company and Hiram B. Scutt, and approved by I. L. Elwood. This agreement contained some twenty-six sections, in the first of which it was stated that the Washburn & Moen Manufacturing Company granted to Hiram B. Scutt, doing business or proposing to do business under the firm name and style of H. B. Scutt & Company, a license to manufacture, use and vend to others 500 tons, in each calendar year during the continuance of the license and agreement, of certain designated styles of barbed fence-wire, under certain letters patent therein enumerated; and it was provided in the second section that Scutt should have the privilege of associating with him in the manufacturing of barbed fence-wire under the license, not to exceed three co-partners in number, as he might choose, at any one time, provided each and every one of said co-partners should first subscribe to the terms and conditions of the license and enter into a written obligation to that effect; and provided also, that the business should always be conducted by said Scutt or said Scutt and associate or associates under the style and firm name of H. B. Scutt & Company.

On the said 18th day of December, 1878, Hiram B. Scutt,

who had negotiated and transacted at Chicago, with Mr. Washburn, of the Washburn & Moen Company, the business pertaining to the settlement of the matters in controversy between the latter company and the Joliet Wire Fence Company, returned to Joliet on the evening train with the above mentioned license, and at once exhibited it to Robertson and James R. Ashley, he meeting them by appointment.

A new firm of H. B. Scutt & Company was organized shortly thereafter, consisting of Hiram B. Scutt, Daniel Robertson and James R. Ashley; C. N. Ashley had also expected to be a member of such firm, and it was the understanding of his brother and of Robertson that he was to be a partner, but an objection being made to him by Scutt, he was persuaded by his brother to not insist upon going into the co-partnership. The new firm bought the machinery and some of the manufactured stock of the wire fence company, and the contract the latter had with the penitentiary authorities for convict labor was transferred to it; and early in January, 1879, the firm commenced to do business as manufacturers of barbed fence-wire under the license.

On the 31st day of December, 1878, Robertson and J. R. Ashley executed a written agreement whereby they agreed to be bound by the agreement between the Washburn & Moen Company and H. B. Scutt during the time they were members of the firm of H. B. Scutt & Company the same as though they were original parties to the same, and promised and agreed to execute each and every requirement thereof in good faith for the term they might be associated with said Scutt in the business of manufacturing said barbed wire. There were no written articles of copartnership entered into by the partners, but the agreement between them was they should each contribute equal amounts to the capital of the firm and should share in the profits equally. The license by its original terms was in force until the 31st day of December, 1885; but by a modification made January 20, 1881, by agreement between the Washburn & Moen Company and the firm, and approved by I. L. Elwood, it was extended to be in full force and effect for the period of seventeen years from the 27th day of February,

1887, or until the 27th day of February, 1894, and the tonnage of the firm was increased to 5,000 tons per year.

H. B. Scutt & Company continued to manufacture fence-wire, doing a large and profitable business, until the 19th day of September, 1881, when James R. Ashley sold out his interest in the firm to Scutt & Robertson for $53,333.33. The tangible assets of the firm at that time, after deducting all debts owing by them, were over $165,000. By the written agreement made by the parties at the date of the withdrawal of said Ashley from the firm, he conveyed to Scutt & Robertson, among other things, all his right, title and interest in and to the contracts, licenses and patents of the firm. The business was continued by Scutt & Robertson, under the same firm name, until the 30th of June or 1st day of July, 1882. In the latter part of March or early part of April of that year Scutt served upon Robertson a written notice that on the 30th day of June, 1882, he would withdraw from the firm of H. B. Scutt & Company, and that from the time of such withdrawal the use of his name in the business, except so far as might be necessary to close up the business of the firm, would not be allowed. For some time prior to the 22d day of April, 1882, Scutt had been endeavoring to sell the tonnage license from the Washburn & Moen Company, and the property and business of the firm of H. B. Scutt & Company. At the date last stated he executed two written agreements, by one of which he agreed, in consideration of $45,000, to assign and transfer to H. B. Scutt & Company, Limited, in Pittsburg, in due form, on or before the 1st day of July, 1882, all rights and licenses held by him, either in his own right or in trust for others, for the manufacture and sale of barbed wire and the use of machines for the manufacture thereof, to include all rights enjoyed by him or H. B. Scutt & Company, of Joliet, in connection with said business, and especially all licenses granted by the Washburn & Moen Manufacturing Company and I. L. Elwood, authorizing the manufacture and sale of 4,000 tons of barbed wire per annum. By the other of said agreements, executed by H. B. Scutt & Company, the machine shop, machines, tools, good will and business of the firm

of H. B. Scutt & Company were sold to H. B. Scutt & Company, Limited, of Pittsburg, for $20,000, the delivery of the property to take place July 1, 1882. In accordance with the provisions of this latter contract the property included therein was delivered to H. B. Scutt & Company, Limited, on the said 1st day of July. On the same day Scutt wrote to the Washburn & Moen Manufacturing Company and I. L. Elwood as follows:

"I have this day assigned to Messrs. H. B. Scutt & Company, Limited, the privilege of manufacturing and selling four thousand tons of barbed wire per annum out of five thousand tons which I am authorized to make by virtue of the license granted by you. I therefore authorize you to cancel my license to that extent, and to grant a new license to the above company for four thousand tons, or to cancel all the outstanding licenses, substituting therefor a new one to them for four thousand tons, and to me for one thousand tons per annum."

On the 3d day of August, 1883, Daniel Robertson exhibited in the Will Circuit Court the bill of complaint now under consideration, against Hiram B. Scutt, for the settlement of the partnership accounts of the late firm of H. B. Scutt & Company. The bill, among other things, alleged that the co-partnership obtained, owned and possessed a license from the Washburn & Moen Manufacturing Company and Isaac L. Elwood to manufacture barbed wire, under which the firm operated and paid royalty, and charged that Scutt, without the knowledge or consent of the complainant, sold, assigned and conveyed the said license and the tonnage and other rights acquired by said firm thereunder to H. B. Scutt & Company, Limited, or to some other corporation, firm or person unknown, for the sum of $45,000; that Scutt had paid no part thereof to complainant, or accounted to him or to the firm therefor; but, on the contrary, had concealed said sale from complainant for a long time after it was made, and denied to him that he had sold the same; and that Scutt now pretends that said license and tonnage was his own property, but that said license and tonnage was in truth and in fact the property of the firm of H. B. Scutt & Company, composed of complainant and said H. B. Scutt.

The substantial and controlling issue made by the bill was whether or not the license of December 18, 1878, was the property and an asset of the late firm of H. B. Scutt & Company. A hearing was had before the court upon the pleadings and the proofs, and an order and decree entered on November 14, 1885, which contained the special findings of fact, to wit:

"First.   That on or about January 1, 1879, Hiram B. Scutt, James R. Ashley and Daniel Robertson entered into a co-partnership as equal co-partners, share and share alike, under the firm name and style of ' H. B. Scutt & Company.'

"Second.   That the agreement and license of date December 18, 1878, from the Washburn & Moen Manufacturing Company, and approved by I. L. Elwood, named in said bill of complaint and as amended subsequent to its date and prior to the withdrawal of James R. Ashley from the said firm of 'H. B. Scutt & Company,' was equitably an asset and the property of the said co-partnership of ' H. B. Scutt & Company.' composed of Hiram B. Scutt, James R. Ashley and Daniel Robertson, and so continued until the withdrawal of the said James R. Ashley from the said firm of ' H. B. Scutt & Company.'

"Third.   That on or about the 13th day of September, A. D. 1881, the said James R. Ashley retired from the said co-partnership of ' H. B. Scutt & Company,' and on said day last named the said James R. Ashley sold, assigned, transferred and delivered to said Hiram B. Scutt and Daniel Robertson, in equal shares, all his right, title and interest in and to the assets and property of the said co-partnership of ' H. B. Scutt & Company,' including the said license above named, as part and parcel of the co-partnership property of ' H. B. Scutt & Company.'

"Fourth.   That at once, upon the withdrawal of said James R. Ashley from the said firm of ' H. B. Scutt & Company,' Hiram Scutt and Daniel Robertson continued a partnership under the name, style and firm of 'H. B. Scutt & Company,' continuing the business of the old co-partnership of ' H. B. Scutt & Company ' under the same name and style, and that

in the new firm of ' H. B. Scutt & Company' said Hiram B.
Scutt and Daniel Robertson became and were equal co-part-
ners, share and share alike, and that the new firm of ' H. B.
Scutt & Company " continued as thus formed until dissolved
by mutual consent on or about the 1st day of July, A. D.
1882.

"Fifth. That the said Hiram B. Scutt and Daniel Robert-
son brought into the new co-partnership of 'H. B. Scutt &
Company,' as capital in equal shares, share and share alike,
the assets and property which were of the old firm of ' H.
B. Scutt & Company' then remaining, and that the said
license above named from Washburn & Moen Manufacturing
Company, approved by I. L. Elwood, of date December 18,
18.8, as amended, became and was the property of the new
firm of ' H. B. Scutt & Company,' composed of Hiram B.
Scutt and Daniel Robertson, and that the said Hiram B. Scutt
and Daniel Robertson, as such co-partners, became and were
equally interested, share and share alike, in the same as sole
owners thereof, and of all moneys, debts, evidences of debt,
assets and property arising or to arise on account thereof."

The cause was then referred to the master in chancery to
state an account with his findings with reference thereto, said
account to be stated in accordance with findings of the court.

The cause was again heard by the court at the September
term, 1886, upon exceptions filed by Scutt, the defendant, to
the report made by the master of his findings and statement
of account. This report of the master was quite voluminous
and contained twelve especial findings, the eighth and twelfth
of which were as follows:

"I charge H. B. Scutt with $600, the amount of a book
account of H. B. Scutt & Company against Daniel C. Stover,
which I find was settled by deed of patent from Stover to
John F. Scutt, made at the special request of H. B. Scutt, and
with interest on said amount from March 8, 1883, the date
of settlement, to September 30, 1886, at the rate of six per
cen., making a total of $727.70.

"Twelfth. I find that H. B. Scutt, at the dissolution of the
partnership of H. B. Scutt & Company on July 1, 1882,

returned and appropriated to his own use 1,000 tons of ton-
nage covered by the license of Washburn & Moen and I. L.
Elwood to H. B. Scutt, and that said tonnage was of the
value of $11,250, being the same value per ton as the 4,000
tons of tonnage sold to H. B. Scutt & Company, Limited, by
H. B. Scutt. I therefore charge H. B. Scutt with $11,250,
with interest thereon from July 1, 1881, to September 30,
1886, at the rate of six per cent. per annum, amounting, prin-
cipal and interest, to the sum of $14,109.35."

The court sustained the exceptions of the defendant to the
eighth and twelfth findings of the master, and overruled all
other of his exceptions to the report; and the report was
referred back to the master to re-state the account in con-
formity with the order of the court then made.

The cause was again heard by the court on the 25th day of
February, 1887, on exceptions filed by each of the parties to
the suit to the second report and the statement of account
made by the master, and all of said respective exceptions
were overruled by the court, and said second report of the
master approved, and a final decree was thereupon entered,
based upon said second report, in favor of Daniel Robertson
and against Hiram B. Scutt, for the sum of $30,063.88 and
costs, and execution awarded therefor.

From this final decree Hiram B. Scutt has taken this appeal
and has assigned errors upon the record; and Daniel Robert-
son, appellee, has assigned cross-errors.

The material question to be determined upon the assign-
ments of error made by appellant is whether or not the Cir-
cuit Court erred in finding that the license issued by the
Washburn & Moen Manufacturing Company, with the consent
of Isaac L. Elwood, to H. B. Scutt, of date December 18, 1878,
with the amendments thereto, was the partnership property
and in equity an asset of the late firm of H. B Scutt & Com-
pany; the cross-errors question the ruling of the court sus-
taining exceptions to the eighth and twelfth findings contained
in the first report of the master.

The evidence found in the record is so very voluminous
and conflicting that it can not well be compared and discussed

within reasonable limits, and we shall therefore not here
undertake so to do to any considerable extent.   In our opin-
ion, the proofs sustain the finding of the court that the license
was equitably an asset, and the property of the co-partner-
ship of H. B. Scutt & Company; without stopping to consider
the antecedent *status* and ownership of letters patent No. 180,-
656, it is clear from the evidence, that on September 29, 1876,
appellant, by his deed of that date, conveyed said letters pat-
ent to the old firm of H. B. Scutt & Company, and that they,
by their deed of September 30, 1876, conveyed said letters
patent to the Joliet Wire Fence Company, and that such con-
veyances were absolute in their terms and were duly recorded
in the patent office in October of that year.   It is also clear
from the evidence, that when appellee, on the first day of
October, 1887, purchased, for the consideration of $10,000
in cash, eighty shares of capital stock in the Joliet Wire
Fence Company, from C. N. Ashley, then a member of the
old firm of H. B. Scutt & Company, and obtained a stock cer-
tificate therefor, signed by appellant as president of the cor-
poration, the title to these letters patent stood vested of record
in the wire fence company; that said letters patent had there-
tofore been put into the capital stock of the company at
$35,000, and that appellant was not claiming or asserting any
right, title or interest, either legal or equitable, in or to said
letters patent, other than that which he held as a stockholder
in the corporation.   Appellee, therefore, had full right to rely
upon their being the absolute property of the corporation.

The decided weight of the evidence is that at and prior to
the negotiations had by appellant with Mr. Washburn at
Worcester early in the fall of 1878, and up to the time of the
final settlement with the Washburn & Moen Company at Chi-
cago and the procurement of the license, it was the understand-
ing and agreement between appellant and those of the stock-
holders of the wire fence company who desired to continue
the manufacture of the barbed wire fencing, that the mission
of appellant in his negotiations with the Washburn & Moen
Company included not only procuring indemnity against dam-
ages for wire already made and sold, but also the making of

Scutt v. Robertson.

some arrangement whereby the fence wire business could be continued. The testimony of Robertson, James R. Ashley, Cyrus N. Ashley and W. S. Brooks is all expressly to that effect, and is sufficient to overcome the testimony of appellant to the contrary. We also think it evident from the testimony of Brooks, and the other evidence in the case, that it was known and understood by all the stockholders that the business was to be continued after a settlement with the Washburn & Moen Company, by a portion of the members of the wire fence company, either as a corporation or otherwise, and that they all acquiesced in such arrangement and in such continuance of the business; and that on the return of appellant from Worcester he reported to them a release of damages could be procured and a license for future operations obtained, but only upon condition the corporation was dissolved and all the patents held by it, including letters patent No. 180,656, were assigned to the Washburn & Moen Company, and a firm organized instead of a corporation, to which the license should be granted. It was plainly in furtherance of the desires of those of the stockholders who did not wish to continue in the barbed wire business, and in furtherance of their interests as they understood them, that the proposed arrangement should be carried out in its entirety. These outside stockholders were all engaged in other business and had discovered they could not continue business pleasantly with Robertson and the members of the old firm of H. B. Scutt & Company. They were anxious to get out of the fence-wire business and be relieved of all liability for damages, and it was of interest to them that some person or persons, or corporation, should continue the manufacture of wire, to whom they could dispose of their machinery, tools, stock, contracts and other property connected with the manufacture of fence-wire.

We think it very plain from the direct evidence, from the surrounding circumstances, from the conduct of the wire fence company and each and every of its stockholders, and from the inherent probabilities of the case, that it was fully understood and agreed by all the stockholders, not only that the patents

should be assigned to the Washburn & Moen Company, but all the rights, titles, interests and benefits that should accrue from the proposed license, to be issued by the Washburn & Moen Company, should vest in and be the property of the firm that should be formed to continue the manufacturing of barbed wire.

It is objected that by the arrangement and agreement as testified to by Robertson and J. R. and C. N. Ashley, said C. N. Ashley was to have been a member of the new firm; that if the fence company was the absolute owner of the letters patent and conveyed the same to Scutt in trust, it was only in trust to secure indemnity for all damages for the past up to January 1, 1879, and that even in trust for any licenses it was in trust for four—Scutt, Robertson and the two Ashleys—and that if Scutt was an agent to procure the license he was an agent for the four persons mentioned, and not the agent of Robertson, James R. Ashley and himself alone. Brooks testifies, in substance, that Scutt made a verbal report when all the members of the corporation were present, that Washburn would have nothing to do with a corporation, it must be a firm; that if they would dissolve the corporation and make an assignment to him of the patents in their hands, he would, in consideration of this and of their forming a company and taking out a license, give them immunity for the past; and that his report was adopted and they agreed to make a settlement. While it is evident from the testimony that it was fully understood by all the stockholders that it was a part of the proposed settlement that a license should be issued to such firm as should be formed by members of the fence company, yet it does not appear that the corporation was ever advised what particular stockholders would enter the proposed firm, or that the individual stockholders, excluding appellant, appellee and the two Ashleys, had such information. So, whatever trust there was in that behalf, was for the benefit of such of the stockholders as should actually become members of the proposed new firm of H. B. Scutt & Company. If Scutt was in fact the agent of the firm in obtaining the license in his own name for the benefit of himself and his co-partners in

the contemplated firm of H. B. Scutt & Company, and one of the four was afterward, by the act and procurement of Scutt himself, excluded and prevented from becoming a member of the firm, and the person so excluded acquiesced in such exclusion and waived all his claims in that behalf, and is making no complaint in regard thereto, and the others also acquiesced in such exclusion, and the firm was actually organized with three members instead of four, then Scutt should be held to be estopped in equity from now claiming he was not the agent, in procuring such license, of the persons who became co-partners when the firm was actually formed.

In our opinion the language used in the first and second sections of the license negotiated by Scutt and dated December 18, 1878, and the fact that on his return to Joliet from Chicago with the license he met appellee and James R. Ashley, by appointment, and displayed to them such license, are strongly corroborative of the claim that in procuring such license he was not acting for himself alone, but as the agent of those who were about to form the new firm, and purchase the property of the Joliet Wire Fence Company.  Strongly corroborative of the same theory, and at variance with the defense now made by him, are the statements contained in his letter of December 9, 1878, to C. Boiltcher, of Boulder, Colorado, in which he says, in his own handwriting:

"Now our affairs wear a different aspect.  A combination has been formed composed of the leading wire manufacturers, and including the Washburn & Moen Manufacturing Company and I. L. Elwood & Company, making the Glidden wire, and ourselves, or rather H. B. Scutt & Company, who will succeed this company on January 1st next.  This combination controls all the valid patents on barb wire, and goes into effect January 1st.  The price of wire will be advanced to 10 c. in car lots, or one half c. more than you paid.  H. B. Scutt & Company assume the liabilities and assets of J. W. F. Co."

In the written agreement signed by appellant, appellee and J. R. Ashley, dated September 19, 1881, executed on the occasion of the withdrawal of the latter from the firm, it is

stated that Ashley conveys to Scutt and Robertson all his right, title and interest in and to the licenses of the firm; and it is the uncontradicted testimony that the firm held no license other than that dated December 18, 1878, executed by the Washburn & Moen Manufacturing Company and approved by Isaac L. Elwood, and the amendments thereto. This circumstance shows that this license was at that time regarded by the copartners as the property of the firm, although, from the evidence, it is probable it was not then considered, at least by said Ashley and appellee, to be of any considerable pecuniary or salable value. It is also a circumstance worthy of notice that as late as the 22d of April, 1882, appellant, in the secret written agreement he made .with H. B. Scutt & Company, Limited, for the sale of 4,000 tons of the tonnage covered by the license, expressly mentions and includes rights and licenses held by him in trust for others and all rights enjoined by H. B. Scutt & Company of Joliet.

We deem it unnecessary to refer to numerous other facts and circumstances in proof. There are some matters of considerable probative force that tend to prove the theory of the case contended for by appellant. Notable among these is the difference between the "consent" which was signed by appellee and James R. Ashley, the substance of which we have given in the statement of the case, and the agreement provided for by the terms of the contract made by appellant with the Washburn & Moen Manufacturing Company, and by which appellant was bound, and the fact that Ashley refused to sign an agreement which would have bound them for and during the period of the existence of the license. Notable, also, is the absence from the inventory that was made of the assets of the firm at the time of the sale of the interest of Ashley to Scutt and Robertson, of all mention of or valuation upon the license. In our opinion, however, especially in view of the circumstances of explanation found in the record and of the weight of the evidence considered as a whole, these facts are not of controlling influence. Our conclusion is, that the alleged errors insisted upon by appellant are not well assigned.

If the tonnage of 4,000 tons per annum which was sold

and transferred by appellant to H. B. Scutt & Co., Limited, was equitably an asset and the property of the firm of H. B. Scutt & Company, composed of appellant and appellee, then the remaining 1,000 tons of yearly tonnage, they both being parcels of the 5,000 tons of annual tonnage included in the license as amended, was also equitably an asset and the property of the co-partnership of H. B. Scutt & Company, composed of appellant and appellee. The evidence, as we understand it, shows that this 1,000 tons of tonnage was at or about the time of the sale and delivery to H. B. Scutt & Company, Limited, and of the dissolution of the firm of H. B. Scutt & Company, of Joliet, appropriated and converted by appellant to his own use. It was included in the license for 5,000 tons, which was, on the first day of July, 1882, surrendered to the Washburn & Moen Company for cancellation, with a request a license for the 1,000 tons should be issued to him, Scutt. This was done without the knowledge or consent of Robertson, and the fact it was or had been done was studiously concealed from the latter, notwithstanding his repeated inquiries for information. The license and its several amendments were in fact canceled, but no new license was issued to Scutt for the 1,000 tons. The license or tonnage to the amount of the 1,000 tons, in some way or manner or by some arrangement which is not male clear by the evidence, remained in the hands of the Washburn & Moen Company, but Scutt got the benefit of it. On his direct examination Scutt testified that the 1,000 tons of tonnage is owned by him, and that he is still manufacturing under it. On his cross-examination he said, "that thousand tons still remains in my name. It is my individual property, and I am manufacturing under it to-day, and am reporting to Washburn & Moen Manufacturing Company my sales." From his acts and his claim of exclusive ownership, it must be presumed, as against himself, that he has converted and appropriated it to his own use. If the 1,000 tons of tonnage was the property of the firm, and Scutt denied the title of his partner therein, and by his pro-

curement, in disregard of the rights of his co-partner, the
license therefor was surrendered and canceled, and the bene-
fits derived from such surrender and cancellation appropriated
by him to his own individual use, it would seem he should, in
equity, account for the value of such tonnage.   The evidence
is very clear that this tonnage was a salable property, and
could readily and easily have been sold and disposed of for
the benefit of the firm.   In Ligare v. Peacock, 109 Ill. 94, it
was held that if a partner, after dissolution of a partnership,
retains the possession of partnership property and appropriates
it to his own use, he must account for it at its fair cash value.
In Laswell v. Robbins, 39 Ill. 202, it was held that where a
partner has been intrusted with partnership property and has
it under his control he must be charged with its value, and to
discharge himself he must account for its disposition and what
he has done with the proceeds; and that in such case the one
partner only has to show that the other received the property
and its value, and the presumption then arises that he is liable,
and to discharge himself he must show some legal defense.
The master in his first report charged appellant with this
1,000 tons, and found that said tonnage was of the value
of $11,250, being the same value per ton as the price at
which the 4,000 tons were sold to H. B. Scutt & Company,
Limited.   The evidence of the witnesses Lambert, Connell,
Curtis, Bishop, Watkins, Collins and Lord, fully sustains the
finding of the master in respect to the value of this tonnage.
We think the Circuit Court erred in sustaining the excep-
tions of appellant to the twelfth special finding contained in
the first report of the master, and in overruling the excep-
tions taken by appellee in respect to the same matter to the
second report of the master, and we think the cross-error
assigned by appellee in that behalf is well assigned, and that
the final decree rendered by the court should have included
the moiety of appellee in this $11,250, with interest thereon
at the rate of six per cent. per annum from July 1, 1882, to
the date of the decree.

In respect to the ruling of the court sustaining the excep-
tions of appellant to the eighth special finding of the master

we find no error. The testimony of appellee himself shows that it was with his knowledge and consent that Scutt made the arrangement with Stover, by which the account of the firm against Stover was settled by the assignment of patent No. 164,947.

For the error of the Circuit Court in refusing to allot as a co-partnership charge against appellant the item of $11,250 and interest thereon, for the conversion and appropriation to his own use of the 1,000 tons of tonnage included in the license as amended, the decree of that court is reversed, and the cause is remanded to said court with directions to enter a final decree in favor of Daniel Robertson and against Hiram B. Scutt, not only for the several items of charge included in the decree hereby reversed, but also including a further charge for the moiety of or equal one-half interest of appellee in said $11,250, with interest thereon at the rate of six per cent. per annum from July 1, 1882, to the date of the entry of the decree. And it is further ordered that the costs of this appeal be taxed to appellant.

*Affirmed in part and reserved in part.*