HIRAM B. SCUTT

*v.*

DANIEL ROBERTSON.

*Filed at Ottawa January 25, 1889.*

127    135
95a  1434

1.  PARTNERSHIP—*assets of the firm—rights purchased by one partner—whether for himself, individually, or for the firm.*   A, the holder of certain patents for fence wire, formed a corporation, with others, to which he conveyed his patents, and afterward, as president of the company, by the consent and direction of the stockholders, assigned such patents to W., another corporation, taking back a license to himself, or to himself and associates, for the manufacture of 5000 tons of fence wire annually, upon certain conditions as to the associates, the license being declared not transferable.   A formed a co-partnership, composed of himself and B and C, styled A & Co., all of whom were corporators in the first named corporation, and who succeeded to its machinery and other property.   C sold his interest to A and B.   Afterward A sold and transferred the firm property to A & Co., limited, and the right to manufacture 4000 tons of fence wire annually, for the price of $45,000.   The firm consisting of A and B was dissolved.   Thereafter, B filed a bill against A for an accounting :   *Held,* that the right to make and sell 5000 tons of fence wire was a valuable property right, having a fixed market value, and that the license giving such right, though issued

to A in his individual name, was, in equity, the property of the firm of A & Co., and a part of the assets of that firm.

2. The license being equitably the property of the firm, the avails of so much of it as was actually sold and transferred by A, whether such sale took place before or after the dissolution of the firm, should be treated as partnership assets. And A should also be held to account, at its market value, for the 1000 tons per annum covered by the license, which he has retained and applied to his own use, or destroyed by voluntarily surrendering it to the licensor.

3. CONTRACT—*waiver of condition*—*by whom.* A license by a corporation to A to manufacture and sell 5000 tons of barbed fence wire annually, for a term of years, gave A the privilege of associating with him in the business not exceeding three partners, on condition they should subscribe to the terms and conditions of the license, the doing of which was declared a condition precedent. The two partners associated with A subscribed a somewhat different obligation to the licensor, which that corporation retained, and the two associates of A declined to execute the obligation required by the licensor. Business was done with the licensees, and new contracts were made by and between the licensor and the licensees, extending the time of the license : *Held,* that the condition in the license that A's associates should execute the obligations required, was for the benefit of the licensor alone, and could not be taken advantage of by A, so as to deprive his associates of the benefits and profits derived under the license, and that the licensor, by its acts and conduct, waived strict performance of the condition.

4. SAME—*contract, as distinguished from a mere license or privilege*— *whether revocable.* A written license, by the holder of letters patent, for making barbed fence wire, to A and his associates, based upon a sufficient consideration, namely, an agreement on the part of the licensees, among other things, to make monthly payments of certain specified royalties upon all the barbed wire manufactured and sold, which, by its terms, was to remain in force for a stated time, subject only to the right of the licensor to revoke for certain defaults, and which was afterward, by an amendatory agreement, extended to a further time, is a contract, and not a mere license or privilege which the licensor might recall or revoke at pleasure, but vests a right to make and sell the wire named.

5. Such a license is, in effect, an assignment, *pro hac vice*, to the licensees, of an interest in the patents, such assignment being revocable only for a breach of some of the stipulations in the contract by which the assignment was made. A provision in the license that it shall not be transferable, is solely for the benefit of the licensor, and it may be assigned when it appears that the parties did not expect it to expire when the licensees should cease to act under it.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. CHARLES BLANCHARD, Judge, presiding.

Messrs. GARNSEY & KNOX, and Messrs. HALEY & O'DONNELL, for the appellant.

Mr. GEORGE S. HOUSE, and Mr. C. A. HILL, for the appellee.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This cause comes here on appeal from a judgment of the Appellate Court, affirming in part and reversing in part, a decree of the Circuit Court. The opinion of the Appellate Court is reported in 26 Ill. App. 80. After a careful consideration of the case, we are disposed to concur in both the conclusions and reasoning of the Appellate Court, and it will therefore be unnecessary for us to do more than briefly state our views, chiefly by way of disposing of certain propositions which have been strenuously urged in this court.

The evidence, in our opinion, fully warrants the conclusion that the license issued to Scutt by the Washburn & Moen Manufacturing Company to manufacture and sell 2500 tons of barbed fence wire per annum under certain letters patent owned by said company, with the subsequent amendments thereto increasing the amount to 5000 tons per annum, was a valuable property right, having a fixed and ascertainable market value, and that though issued to Scutt in his individual name, it was in equity the property of the firm of H. B. Scutt & Co., and a part of the assets of that firm. Such being the case, the avails of so much of the license as was actually sold and transferred by Scutt, whether such sale took place before or after the dissolution of the firm, should be treated as partnership assets. Nor are we able to perceive any reason why Scutt should not be held to account, at its market value, for the 1000 tons per annum covered by the

license, which he has either retained and applied to his own use, or destroyed by voluntarily surrendering it to the licensors.

The evidence showing that Scutt, in obtaining the license, was not acting for himself alone but for himself and the persons who were to be associated with him in business under the firm name of H. B. Scutt & Co., is sufficiently stated and commented upon in the opinion of the Appellate Court. The proper conclusion is, that, in equity, as between the partners, the license must be treated precisely as though it had been issued to the firm. But it is urged that, as the license by its terms was not transferable, it was a mere personal privilege granted to Scutt and his co-partners to be operative so long as they might continue to act under it, but incapable of being converted into cash by sale. This we think does not fairly state the case.

What is called a license was in fact a contract containing various stipulations by the contracting parties, and based upon a sufficient consideration, viz., an agreement on the part of the licensees, among other things, to make monthly payments of certain specified royalties upon all the barbed wire manufactured and sold. By the original contract it was stipulated that the license should remain in force until December 1, 1885, subject only to the right on the part of the licensors to forfeit it in case of willful default by the licensees, on giving thirty days notice of their intention so to do. By the amendatory agreement of January 20, 1881, the continuance of the license was extended to February 27, 1894. It is clear then that the license was not a mere privilege which the licensors could recall or revoke at pleasure, but a vested right to manufacture and sell barbed wire under the various patents owned by the licensors until such patents should expire. It was in effect an assignment, *pro hac vice,* to the licensees, of an interest in the patents, such assignment being revocable only for a breach of some of the stipulations in the contract by which the assignment was made.

Nor does it seem to us to be material, so far as the present controversy is concerned, that the license by its terms was not transferable. That was manifestly a provision inserted for the sole benefit of the licensors, so as to prevent a transfer of the license to parties who might not be acceptable to them, but, when viewed in the light of the surrounding circumstances, it does not show that it was within the contemplation of the parties at the time, that the license was to expire whenever the licensees ceased to act under it, or that it might not be transferred by the express consent of the licensors. The consideration for which it was granted, and the subsequent dealings of the parties with relation to it, both tend to show a tacit understanding between the licensors and the licensees that the former were to give their assent to and ratify any transfer made by the latter, if made to satisfactory parties and upon satisfactory terms. Scutt assumed the assignability of the license in his contract of April 22, 1882, in which he agreed to transfer and assign, in due form, said license, to the extent of authorizing his assignees to manufacture and sell 4000 tons of barbed wire per annum, and in his subsequent execution of such assignment, and also in his letter of July 1, 1882, to the licensors, apprising them of the assignment he had that day made, and requesting or authorizing them to cancel the license to the extent of 4000 tons and to issue a new license to his assignees for that amount, or to cancel the license altogether and issue a license for 4000 tons to his assignees and a new license for 1000 tons to him. The transferability of the license was also assumed and admitted by the licensors in their compliance, without hesitation or question, with Scutt's request, by making out a new license for 4000 tons running to his assignees. The licensors are not now assuming and never have assumed that the license was not available to the licensees by way of sale when an acceptable purchaser was presented, nor have they interposed the slightest obstacle to a sale to such purchaser, but on the con-

trary, as we have just remarked, they seem to have instantly complied with Scutt's request to execute such papers as would give practical effect to his contract of assignment.

But it is said that Ashley and Robertson, Scutt's co-partners, cut themselves off from all benefit or interest in the license, after the termination of their partnership relation with Scutt, by their refusal to accede to certain terms proposed by the licensors. In order to properly understand the question here raised, it will be necessary to recur briefly to some of the terms of the license itself. That instrument was in the form of an agreement between the licensors of the one part and Scutt of the other part, and signed by both of said parties, and comprising twenty-six paragraphs, embodying a large number of conditions and provisions to be assented to and performed by the licensees. The second paragraph gave Scutt the privilege of associating with himself in the manufacture of barbed fence wire under said license, co-partners not exceeding three in number, and provided that such co-partners should each first subscribe to the terms and conditions of the license by a written obligation to that effect, to be deposited with the licensors. The third paragraph declared that the license was granted upon the express conditions therein contained, to be performed and complied with by Scutt and his associates, as conditions precedent to the continuance of the license. The tenth paragraph stipulated that Scutt and the persons comprising his firm thereby acknowledged the validity of the letters patent in said license mentioned and each of them, and agreed to act in good faith and use their best endeavors to maintain such patents and each of them, and not to set up any defense to the validity of such patents or any of them or deny in any way the validity thereof in any suit or suits which might be instituted against their firm or the individual members thereof or either of them, upon or under said license. By the twentieth paragraph it was agreed that each and every person who should be associated with Scutt under said license should, be-

fore being admitted to any of the rights and privileges of the same, agree in writing to accept and abide by all the covenants and conditions therein contained, as if they had originally been parties thereto, and deposit such writing with the licensors.

The license was dated December 18, 1878, and on the 31st day of the same month Ashley and Robertson executed to said licensors their agreement, reciting the execution of the license and their association with Scutt in the manufacture of barbed wire, and agreeing as follows:

"Now, therefore, we, the said James Ashley and Daniel Robertson, do each acknowledge that we have read the above mentioned contract or agreement between the Washburn & Moen Manufacturing Company and H. B. Scutt; that we are familiar with each and every detail of said agreement, and do hereby agree that we will be bound by said agreement during the time that we are members of the firm of H. B. Scutt & Co., the same as though we were original parties to the same, and promise and agree to execute each and every requirement in good faith, for the term that we may be associated with said H. B. Scutt in the business of manufacturing said barb wire."

This agreement was transmitted by Ashley and Robertson to the licensors, and it was by them retained, and by them produced at the hearing of this cause. But it does not seem to have been quite satisfactory, for they appear to have drawn up another paper for Ashley and Robertson to sign, which by its terms bound them to acknowledge the validity of said patents so long as the license continued in force. This Ashley and Robertson declined to execute, and it is claimed that such refusal limited their interest in the license to the period during which their partnership relation with Scutt continued.

It may be admitted that their agreement was not a full and literal compliance with the requirements of the license, and that the licensors might well have objected to their admission to the firm of H. B. Scutt & Co. or to their assuming any

rights under the license. This, however, the licensors did not choose to do. Notwithstanding the refusal of Ashley and Robertson to execute precisely such instrument as they desired, they retained the one they had executed and elected to treat the arrangement with them as fully consummated. The firm of H. B. Scutt & Co. commenced doing business about January 1, 1879, and embarked in the manufacture and sale of barbed fence wire under said license, rendering monthly statements to the licensors and paying them royalties, and continued so to do down to July 1, 1882, when the firm was finally dissolved and ceased doing business. Twice during that time, viz., January 20, 1881 and October 13, 1881, the license was amended and its scope enlarged by supplementary agreements. By these agreements the original agreement was re-affirmed with divers modifications and amendments, and the amendatory agreements were both signed by the firm of H. B. Scutt & Co. During all the time the firm was in existence the licensors made no objection that Ashley and Robertson, or Robertson alone after Ashley retired from the firm, had failed to comply with the conditions of the license so far as it related to the execution of the stipulated agreement acknowledging the validity of the letters patent. Possibly the licensors were of the opinion that the acceptance by the members of the firm of H. B. Scutt & Co. of the license with all its conditions and agreements as effectually bound them to a recognition of the validity of said patents as their express agreement to that effect would have done. Possibly they were of the opinion that the subsequent execution by the firm of the supplementary agreements bound the members of the firm to the terms and conditions of both the supplementary and original agreements as effectually as though they had been original parties thereto. But however this may be, it is difficult to see how the licensors, if they were parties to or in any way interested in the present controversy, could now object for any purpose that the terms of the license had not been fully

complied with by the co-partners of Scutt. The admissions to be implied from their conduct would no doubt be conclusive against them. And it does not appear that they have ever been disposed to question Ashley's or Robertson's interest in the license. Their attitude at the dissolution of the firm seems to have been that of entire willingness to consent to the transfer of the license to any unexceptionable assignee whom Scutt or the firm might designate.

It should be remembered, however, that the present controversy is between the members of the firm, and one in which the licensors have no interest whatever. Nor has Scutt any interest in the question whether his co-partners executed the contract stipulated for in the license, or otherwise failed to meet the just requirements of the licensors. So long as the latter are in no way questioning the interest of Scutt's co-partners, we are unable to see how he can assert a right which they have seen fit to waive. As between the parties to the present controversy, the case is narrowed down to these questions, 1, whether the license was a property right possessing any value as an asset, and, 2, whether it was a right belonging to the firm and therefore a partnership asset. The opinion of the Appellate Court resolves both these questions in favor of Robertson by arguments which are entirely satisfactory to us, and the judgment of that court will accordingly be affirmed.

*Judgment affirmed.*

Mr. JUSTICE BAKER, having passed upon this case in the Appellate Court, took no part in its consideration here.